399 So.2d 172 (1981)
STATE of Louisiana
v.
Jimmy Stacy WHITE.
No. 80-KA-2519.
Supreme Court of Louisiana.
May 18, 1981.
Rehearing Denied June 22, 1981.
*173 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Paul J. Carmouche, Dist. Atty., Sonia D. Peters, and Dale Cox, Asst. Dist. Attys., for plaintiff-appellee.
W. Michael Adams, of Blanchard, Walker, O'Quin & Roberts, Shreveport, for defendant-appellant.
DENNIS, Justice.[*]
Defendant, Jimmy Stacy White, was convicted by a jury of manslaughter, La.R.S. *174 14:31, and sentenced to serve four years in prison at hard labor. On appeal he urges six assignments of error in which we find no reversible error. Consequently, we affirm the defendant's conviction and sentence.
In the early morning hours of June 10, 1979, the defendant returned home from drinking beer with neighbors and found that his wife had gone out during his absence. She returned shortly, however, and entered the house holding his pistol. After confronting her, the defendant, according to one of his confessions, grabbed the gun and slung the holster from it, intending to hit her with it. He pulled the trigger instead and the bullet creased the left side of his wife's head. He immediately took her to the hospital where she died later that day.
ASSIGNMENT OF ERROR NO. 1
The defendant assigns as error the trial court's denial of his motion to suppress inculpatory statements made by the defendant. The first contested statement was made by the defendant to Officer Allen Hall of the Shreveport Police Department while at the hospital.
Hall testified that he observed the defendant's car travelling at a high rate of speed and followed it to the hospital. In part to obtain information requested by hospital personnel, Hall asked the defendant his name, the name of the victim, and his relationship to her. Hall also asked where the shooting occurred to determine whether it had happened within city police jurisdiction. The defendant responded that the shooting occurred on Pinehill Road. The officer then asked the defendant who shot the woman. The defendant stated that he had shot his wife and continued without further questioning from Hall to explain what happened. According to Hall, the defendant said he argued with his wife before leaving to have drinks with friends. When he came back, his wife was out, but she returned shortly. As the couple quarreled again, defendant's wife pulled out a gun and aimed it at him. The defendant took the gun, pointed it at his wife, and shot her.
The defendant contends that the trial court should have granted his motion to suppress because he was not given Miranda warnings immediately when he revealed he had shot his wife. The state argues that Miranda warnings were not required because the defendant was not subjected to custodial interrogation during his statement to Hall.
The evidence supports the trial court's ruling. The officer's questions were posed during a general investigation of the shooting before the defendant was placed in custody or became the focus of the investigation. Miranda warnings are not a prerequisite to admissibility of statements taken by officers during non-custodial, general on-the-scene investigations, conducted to determine the facts and circumstances surrounding a possible crime, absent a showing that the investigation has passed the investigatory stage and has focused on the accused. State v. Weeks, 345 So.2d 26 (La. 1977); State v. Brown, 340 So.2d 1306 (La. 1976). It was only as the defendant gave the incriminating details of the killing that the investigation focused on the defendant and the officer decided to detain him. The defendant does not allege that his statement was involuntarily made. The answer to a later question by Hall was suppressed.
The defendant also unsuccessfully sought to have his oral statements made to Detective Ron Strother at the Caddo Parish Sheriff's Office suppressed. He concedes that he was fully advised of his Miranda rights, but contends that his statements were nevertheless involuntarily made. He alleges that he was so emotionally upset and physically exhausted that he was incapable of freely and voluntarily waiving his Miranda rights.
*175 The trial judge's determination that the state satisfied its burden of proving that these statements were freely and voluntarily given is amply supported by the record. Although the defendant was understandably upset over the events of the past few hours, his emotional distress and fatigue were not so great as to vitiate the free and voluntary nature of his statements. The record shows that no threats, promises, or undue pressure were used. The defendant displayed no reluctance or inability to make these statements. Both statements were virtually identical, the second statement was recorded and its transcription forms the basis of assignment of error three.
This assignment is without merit.
ASSIGNMENT OF ERROR NO. 2
The defendant argues that the trial judge erred in denying his motion to suppress a gun, holster, and photographs resulting from a warrantless search of his residence.
The testimony offered at the hearing on the defendant's motion to suppress this tangible evidence revealed that Deputies Kemper and Lowery went to the defendant's residence when they received information that there had been a shooting in the area. They had not been provided with an exact address, but saw a house where the lights were on, the stereo was playing, and the front door was open. They approached and saw blood on the floor and wall through the screen door. They knocked, but no one answered. One deputy went next door to see if they had found the Whites' house and if the neighbors knew about a shooting. Defendant's mother lived next door and his daughter was spending the night with her. They were unaware of the shooting and were eager to enter the Whites' house. The deputies refused the relatives access but entered themselves to determine if there were other participants in the incident. They saw a trail of blood leading from the front door to the kitchen where they found a gun on the kitchen table. However, the officers did not seize the gun nor disturb the scene in any way. Instead, they called the sheriff's office to request that an investigator be sent for.
Detective Ron Strother arrived at the house about thirty minutes later and was met there by Deputy Malec, an identification officer, Deputy Lowery and Deputy Kemper. Strother had not yet interviewed the defendant and knew only that a shooting had been reported. He and Malec entered the house, took photographs, and seized the defendant's gun and holster. This second search of the house lasted about forty-five minutes. Afterwards, but before leaving the scene, the deputies were informed that the defendant's wife had been shot and that the defendant had taken her to the hospital.
The United States Supreme Court in Mincey v. Arizona, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978), held that a "murder scene exception" created by the Arizona Supreme Court to the warrant requirement is inconsistent with the Fourth and Fourteenth Amendments, and restated the rules governing the search of a person's home. Warrants are generally required to search a person's home or his person unless "the exigencies of the situation" make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment, Mincey v. Arizona, supra, at 394, 98 S.Ct. at 2414, 57 L.Ed.2d at 301; McDonald v. United States, 335 U.S. 451, 456, 69 S.Ct. 191, 193, 93 L.Ed. 153, 158 (1948). For example, the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid. Similarly, when the police come upon the scene of a homicide they may make a prompt, warrantless search of the area to see if there are other victims or if a killer is still on the premises. Mincey v. Arizona, supra, 437 U.S. at 392, 98 S.Ct. at 2413, 57 L.Ed.2d at 300. Cf. Michigan v. Tyler, 436 U.S. 499, 509-10, 98 S.Ct. 1942, 1949-50, 56 L.Ed.2d 486, 498-99 (1978). And the police may seize any evidence that is in plain view during the course of their legitimate emergency activities. Michigan v. Tyler, supra, 436 U.S. at 509-10, 98 S.Ct. at 1950, 56 *176 L.Ed.2d at 498; Coolidge v. New Hampshire, 403 U.S. 443, 465-66, 91 S.Ct. 2022, 2037-38, 29 L.Ed.2d 564, 582-83 (1971). But a warrantless search must be "strictly circumscribed by the exigencies which justify its initiation." Mincey v. Arizona, supra, 437 U.S. at 393, 98 S.Ct. at 2413, 57 L.Ed.2d at 300, citing Terry v. Ohio, 392 U.S. 1, 25-26, 88 S.Ct. 1868, 1882, 20 L.Ed.2d 889, 908 (1968). See also Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969) (search of arrested suspect and area within his control for weapons or evidence); Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967) ("hot pursuit" of fleeing suspect); Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) (imminent destruction of evidence).
Applying these precepts, we conclude that the initial warrantless search of defendant's residence was justified under the circumstances. Deputies Kemper and Lowery were entitled to make a prompt warrantless search of the premises to see if there were other victims or persons in need of immediate aid or if a killer was still on the premises. Moreover, their search was strictly confined to this purpose. Mincey v. Arizona, supra.
We have grave doubts, however, that the second search by officers Strother and Maler was lawful. Before Strother and Maler entered the defendant's house, the emergency justifying the first search was over. The possibility of other victims or culprits inside had been eliminated. Furthermore, the second search cannot be justified in this case on the grounds of the need to preserve evidence. There was no real indication that evidence would be lost, destroyed or removed during the time required to obtain a search warrant. Although the house was unlocked and defendant's relatives lived next door, it appears the state had sufficient manpower to guard the house while a warrant was obtained. And there is no suggestion that a search warrant could not easily and conveniently have been obtained.
Ultimately, we conclude, however, that the error committed in permitting introduction of the evidence gathered during the second search was harmless and not reversible. It appears that there is no reasonable possibility that the evidence complained of might have contributed to the conviction, and we are able to declare a belief that the error was harmless beyond a reasonable doubt. State v. Gibson, 391 So.2d 421 (La.1980). The state and the defendant agree that his wife was shot with the pistol after he grabbed it from her hand. The only disputed factual issue in the case was whether the defendant intended to strike or assault his wife with the pistol at the time of the shooting, i. e., whether the homicide was committed when the defendant was engaged in an aggravated battery or an aggravated assault. The evidence gathered during the second search, viz., the gun, holster and photographs, did not tend to prove or disprove this essential element of the crime or affect the credibility of the defendant as a witness.
ASSIGNMENT OF ERROR NO. 3
The defendant unsuccessfully challenged the admissibility of the original transcription of an oral statement made to Detective Strother which was tape-recorded. He argues that because the transcription contained errors and omissions from the taped statement it was not admissible since it was not used in its entirety contrary to the provisions of La. R.S. 15:450. The defendant claims that he was prejudiced by these variances with the taped statement.
We do not believe that La. R.S. 15:450 is applicable to this situation, neither do we find that the defendant was prejudiced by the admission of the original transcription.
The defendant and his attorney both signed the original transcription after briefly glancing over it. The introduction of the original erroneously transcribed, but signed statement, was to prove to the jury that the defendant had acknowledged making the recorded statement. Both the taped statement and a corrected transcript of the statement were presented to the jury. The *177 scattered typographical errors and omissions in the original transcription were clearly pointed out to the jury.
The defendant's argument is without merit.
ASSIGNMENT OF ERROR NO. 4
The defendant requested the trial court to grant a mistrial at the conclusion of the prosecutor's closing argument. The defendant assigns as error the denial of that motion. He contends that the prosecutor's remarks exceeded the permissible scope of argument and improperly influenced the jury's verdict. The objected-to portion of the prosecutor's remarks was as follows:
"it is up to [the] Judge to determine sentence. And there is no minimum under the law. The reason why isor one of the reasons I suggest to you, that it [is] up to the Judge, he hears the same facts that you hear, and he gets that history that you heard. It is up to him to decide whether a person goes to jail or whether he receives a suspended sentence. What you heard today was relevant to the issue. I suggest to you during the sentencing of what a Judge can do in a situation like this when I tell you there is no minimum sentence and there is nothing to prevent this Judge from not imposing not one day in jail. Yes he is subject to jail time, I'll tell you that too. He's subject to going to jail. He's also subject to receiving a suspended sentence and walking out of the courtroom on probation. And it isthat's strictly up to the Judge."
Argument must be confined to the evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case. La. C.Cr.P. art. 774. In other than capital cases and cases carrying mandatory penalties, this court has held that sentencing regulations form no part of the "law applicable to the case." See State v. Harris, 258 La. 720, 731, 247 So.2d 847, 850 (1971). In Harris, we said that to allow argument of these matters would inject irrelevant considerations into the jury's deliberations as to guilt.
The state contends that the remarks were in response to defense counsel's closing argument portraying the defendant as a good man who would continue to suffer with the painful realization that his wife was dead at his hands. The state argues that the defense counsel's remarks implied that the defendant would have to go to jail if convicted and that the defendant had already been punished enough.
Although the prosecutor's remarks did not misstate the law, we do not approve of such references. The jury should not be tempted to take more lightly its responsibility to hold the state to its burdensome task of proving guilt beyond a reasonable doubt by remarks which suggest that the judge may act leniently toward the defendant in the sentencing stage. The prosecutor did emphasize, however, that sentencing was in the sole province of the judge. The judge repeated this in his jury instructions and reminded the jury that the arguments of counsel were not evidence and that it was to take the law as given them by the court.
We do not believe the trial court erred in its determination that any prejudice caused by the prosecutor's remarks was cured by his jury instructions and that the defendant was not prevented from receiving a fair trial.
ASSIGNMENT OF ERROR NOS. 5 AND 6
The remaining assignments challenge the sufficiency of the evidence supporting defendant's conviction. The defendant alleges the trial court erred in failing to grant his motion for a new trial on that basis.
The theory of the state's case was that the defendant committed a homicide while engaged in an aggravated battery or an aggravated assault. The state correctly points out that such a homicide is defined as manslaughter by La. R.S. 14:31(2)(a), and that intent to cause death or great bodily harm need not be proved. The defendant urges that there was insufficient evidence presented to establish an intentional misdemeanor directly affecting the person and that the evidence shows at most that he is guilty of negligent homicide.
*178 The defendant made three statements to the police the morning of June 10th only hours after the shooting. In each statement he gave some indication that he and his wife were having an argument. In defendant's tape-recorded statement to Detective Strother the following admission appears (as per the corrected transcription):
"Q. You asked her what she was doing with the pistol?
"A. Yeah. I got mad and I snatched it away from her, I snatched it away from her, I guess I slung it out of the holster, and I guess I was going to rap her upside the head with it because it didn't seem like it was that important, and instead of that, I guess I squeezed the trigger."
The state contends that by the defendant's own admission he intended to hit his wife with the gun, an intentional misdemeanor directly affecting the person.
The defense argues that the various accounts of the shooting made by the defendant June 10th were refuted by his trial testimony which was to the effect that he had not been mad at his wife, but merely concerned about her possession of a gun, because he knew she was scared of guns. He testified that as she was going through the door he reached down and caught her hand, and when he pushed the door shut, he brought the gun up and it went off.
The jury had ample opportunity to evaluate the credibility of the various witnesses. When the evidence is viewed in the light most favorable to the prosecution, we conclude that a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
These assignments lack merit.
For the reasons assigned above, the defendant's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[*] The Honorables O. E. Price and Fred W. Jones, Jr. of the Court of Appeal, Second Circuit, and G. William Swift, Jr. of the Court of Appeal, Third Circuit, participated in this decision as Associate Justices pro tempore, joined by Chief Justice John A. Dixon, Jr. and Associate Justices Walter F. Marcus, Jr., James L. Dennis and Jack Crozier Watson.