598 So.2d 565 (1992)
STATE of Louisiana
v.
Frank M. BROWN.
Nos. 90-KA-1804, 90-KA-1805.
Court of Appeal of Louisiana, Fourth Circuit.
April 14, 1992.
*568 Terry Allbritton, Appellate Advocacy Program, Tulane Law School, New Orleans, and Peter A. Barbee, Plaquemines Parish, Indigent Defender Board, Point-a-la-Hache, for defendant-appellant.
Before BARRY, WARD and ARMSTRONG, JJ.
ARMSTRONG, Judge.
Defendant, Frank M. Brown, was indicted for the second degree murder of Kenneth Dubois on March 4, 1989, in violation of La.R.S. 14:30.1 (case no. 89-1771F). He pleaded not guilty, and after a sanity commission hearing, was found competent to stand trial. He was tried by a twelve-person jury which returned a responsive verdict of guilty of manslaughter. The State subsequently filed a bill of information charging defendant as a habitual offender; the hearing thereon was held May 3, 1990 (case no. 90-1361F). On June 13, 1990, defendant was adjudicated a second-felony offender and was sentenced to serve thirty years at hard labor. Both cases were lodged as separate appeals and have been consolidated.

FACTS
On the morning of Sunday, March 5, 1989, Detective Kelly Voebel and Deputy Gary Moore of the Plaquemines Parish Sheriff's Office were told by their commanding officer, Chief Ralph Ferranto, to investigate a possible homicide in Davant. Chief Ferranto told them Walter Ragas had called to inform him that defendant had threatened to kill and burn up Kenneth Dubois who lived with defendant on a farm owned by Leonard Murrell.
Deputy Moore had known defendant for several years and would sometimes stop by the farm to check on defendant. He and Detective Voebel drove to the Murrell farm where defendant was a sharecropper. Defendant lived in a small outbuilding or shed which sat behind the unoccupied main residence. A driveway of some 300 to 400 feet led to the main house and outbuilding. A large plowed field was in front of the house. The farm was not fenced.
When the officers arrived, they saw a large fire in the field in front of the house. Defendant, who had the nicknames of "Nutria" and "Nutria Rat," came out of the shed and left its door open. Deputy Moore knew that defendant owned a .22 caliber rifle and asked defendant where it was. Defendant told him that it was in the shed beside the door. Deputy Moore then went to the outbuilding and seized the gun.
The officers asked defendant where Dubois was, and defendant told them that Dubois had left the farm. They were about sixty to seventy yards from the fire, and Detective Voebel smelled what he believed to be burned human flesh. He asked defendant what he was burning, and defendant replied that he was burning tires and tree stumps. The detective then asked what else he was burning, and defendant replied that he had shot a stray dog and had thrown it into the fire. Detective Voebel asked if defendant had a rake he could use to sift through the ashes. Defendant said that he did not, but that he did have a hoe which he got and gave to Detective Voebel.
They walked over to the fire, and while he sifted through the ashes he saw a piece of meat which was charred and burning. It started to rain, and Detective Voebel told Deputy Moore to take defendant to the porch of the main house. He was also about to go to the house when Mark Isidore, a neighbor, drove up. Isidore asked if he had found anything and told the detective that the night before defendant had come to the house. Isidore said that defendant told him that he had killed someone and burned them. Isidore said that he asked defendant who he had killed and that defendant said that he had killed a dog. Detective Voebel told Isidore that the matter was still under investigation, and Isidore left.
Detective Voebel joined defendant and Deputy Moore on the porch of the main house. Defendant became nervous and agitated, *569 and he blurted that he killed the man and that he had to kill him because the man was going to kill him. Defendant was told to say nothing more, and Deputy Moore took him to the police car where he was given his Miranda rights. Sometime later, Chief Ferranto and other deputies arrived at the farm, and defendant was taken to the parish jail.
The fire and the shed were searched by the officers. Bone fragments and teeth were found in the fire, and the "piece of meat" found by Detective Voebel was later determined to be part of a human torso. Inside the shed, the officers found .22 caliber cartridges, blood stains on the floor beneath a chair, and a bloodstained cloth. They also found outside a patch of blood in the dirt.
At the parish jail, defendant gave a taped confession to Detective Voebel. Defendant stated that he killed Dubois in self-defense. He had known Dubois for a long time but had not considered him a friend. Dubois had been sent to live at the farm a week earlier, and defendant said that he had no objections because he knew Dubois needed a place to live. Dubois had been charged with fatally stabbing his father, and defendant stated that Dubois always talked about stabbing his father. On the evening on March 4, defendant said that he and Dubois went to Marginal's Grocery Store where they drank beer. He stated that he had drunk three to four six-packs and two quarts of beer. After returning to the farm at around 6:30 p.m., defendant said that he was trying to sleep and that Dubois kept talking about stabbing his father. Defendant said he told Dubois to shut up but Dubois kept mumbling. Defendant said that he heard his dog yelp and assumed that Dubois had kicked the dog. Defendant told Dubois that he would kick Dubois if Dubois kicked the dog again, and he then got up to urinate out of the front door. He turned around, was hit in the head with a stick, and fell to the ground. Defendant stated that Dubois threatened to get a knife and "cut" him. Defendant said that he grabbed his gun and shot Dubois in the head. He said that he burned the body because he was drunk, scared, and did not know what to do. Defendant denied threatening to kill and burn anyone when he was at the grocery.
The next day the shed was again searched, and the officers found another blood spot in front of the heater, blood under a chair, blood on a screen under the chair, a bloodstained blue jeans jacket, and another jacket with blood on it. Outside the shed, a spent .22 caliber cartridge was found, and more bone fragments and teeth were recovered.
Walter Ragas, who lived near the farm and had known defendant for a short time, testified that he saw defendant and Dubois at Marginal's at around 6:00 p.m. on March 4th. Defendant told Ragas that he did not want Dubois to live with him any longer but he did not say why. They drank some beer together, and Ragas, defendant, and Blaize Isidore went outside. Defendant and Blaize got into an argument, and Ragas testified that defendant told Blaize that he would kill and burn Blaize. They were arguing over money that Blaize owed defendant. A short while later, defendant and Dubois left together. Ragas left for work, and when he returned home the next morning, he and his sister-in-law talked about her seeing a fire in the field. Ragas, who denied seeing the fire, said that he went to see defendant, who told Ragas that he had given Dubois some money to a buy a woman. Ragas said that he and two friends then went to see Chief Ferranto to tell them about what had happened the night before and about the fire. Ragas denied that he was testifying against defendant because defendant refused to let Ragas and Blaize cut up copper tubing allegedly stolen by Ragas from the water plant where he had formerly worked.
Blaize Isidore testified that he had been drinking at Marginal's on the evening of March 4th with defendant, Dubois, and others. Blaize stated that he asked defendant why he was not drinking with his buddy, meaning Dubois. Blaize testified that defendant said that he was going to kill Dubois and burn him but did not say why. He testified, as did Ragas, about the threat *570 against him made by defendant outside the store.
Mark Isidore testified that on the night of March 4th defendant came over to his house. Mark stated that defendant was crying and looked "kind of juiced up." Mark testified that defendant told him that he had killed somebody or something. Mark asked him who he had killed, and defendant said that he had killed a dog. Mark then asked if something had happened between him and Dubois, and defendant said that he had killed him. Defendant showed Mark a bruise on his forehead, and Mark commented that they must have had a fight. Defendant told Mark he got the bruise falling off the tractor, and Mark told defendant to come back tomorrow to talk. Mark could see a fire at the farm.
The human remains found in fire could not be positively identified as those of Dubois, and no cause of death could be determined. The blood stains in the shed were not defendant's blood type.

ERRORS PATENT
Our review of the record reveals no errors patent.

ASSIGNMENT OF ERROR NO. 1
In his first assignment of error, defendant complains that the trial court erred in denying his motion to suppress the evidence. He asserts that nothing justified either the warrantless seizure of his rifle, the warrantless search of the fire, or the warrantless search of the outbuilding where he lived. Defendant argues that none of the exceptions to the requirements of a search warrant existed such as exigent circumstances or the plain view exception.
In this case, there were essentially three separate searches and seizures, to wit: 1) the seizure of defendant's rifle; 2) the search of the fire in the field; and 3) the search of defendant's living area after he was taken into police custody. From a review of the record, none of these three searches and seizures was conducted pursuant to a search or arrest warrant.
A warrantless search and seizure is presumed unreasonable unless it is justified by one of the exceptions to the warrant requirement. State v. Talbert, 449 So.2d 446 (La.1984); State v. Lyons, 514 So.2d 558 (La.App. 4th Cir.1987), writ denied, 581 So.2d 680 (La. 1991). The State bears the burden of affirmatively showing that one of the exceptions applies. Id. The State did not file a brief in this matter which would have set forth the exceptions upon which it relied to justify the warrantless searches. From a reading of the transcript of the hearing on the motion to suppress, it appears that the State relied upon the safety of the officers and exigent circumstances to justify the warrantless searches and seizures.
The first search and seizure to be analyzed is that of defendant's .22 caliber rifle from inside the shed in which he lived. This gun was seized by Deputy Moore upon arrival at the farm. Deputy Moore testified that he knew defendant had the gun and that he wanted to secure the gun for his safety. He testified that he asked defendant where the gun was and that defendant told him that it was standing by the door inside the shed. The door had been left open when defendant exited the shed upon the arrival of the officers. Deputy Moore reached into the shed and retrieved the rifle which he kept while speaking to defendant.
One of the well-recognized exceptions to the warrant requirement is that a police officer may make a limited search of a person for weapons when the officer has a reasonable suspicion that the person to be searched has, is, or is about to commit a crime. La.C.Cr.P. art. 215.1; Michigan v. Long, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983); Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); State v. Reed, 388 So.2d 776 (La. 1980). The officer can seize the weapon from the person himself or from within his immediate control for the protection of the officer's safety. Michigan v. Long, supra; State v. Smason, 572 So.2d 710 (La.App. 4th Cir.1990), writ denied, 575 So.2d 376 *571 (La.1991); State v. Zilton, 516 So.2d 178 (La.App. 4th Cir.1987).
In State v. Lee, 485 So.2d 555 (La.App. 5th Cir.1986), the police received a report that two males in a black car were attempting to sell marijuana at a certain location. The deputies proceeded to the location and found the car and the suspects seated inside. The police asked the occupants to exit the car which they did willingly and went to rear of the deputies' car where they were questioned. One of the deputies looked inside the suspects' car and saw a backgammon case sticking out from under the front seat. She opened the case and found marijuana cigarettes. The trial court denied the motion to suppress, but the Fifth Circuit reversed finding no reasonable cause to stop the suspects. The court noted that even if reasonable cause existed, the search of the interior of the car was not justified because there was no basis to warrant a belief that the deputies' safety, or that of others, was in danger. At the time of the search, the suspects were far away from the car and its contents; thus, there was no way to construe a colorable threat to the officers.
In the instant case, there is scant basis to justify the seizure of defendant's gun. There was reasonable cause to question defendant regarding the report to Chief Ferranto that defendant may have murdered Dubois and burned his body. Thus, Deputy Moore would have been justified in removing any weapons from defendant's person or within his immediate control. However, there is nothing in the record to show that the rifle was within defendant's immediate control. Neither Deputy Moore nor Detective Voebel testified that defendant made any threatening moves or attempted to go for his gun prior to the seizure of the gun. Defendant was outside the shed when the officers approached him, and there is no testimony as to his proximity to the shed and the gun. In fact, from the testimony, it appears that defendant was walking away from the outbuilding while the gun was seized. The rifle should have been suppressed.
The second search that must be analyzed was the search of the fire in the field in front of the main house at the farm. Defendant argues that this search was unlawful because there is no "plain odor" exception to the warrant requirement, defendant did not consent to a search of the fire, and there was no showing of the imminent destruction of evidence. There is no merit to defendant's arguments on this point.
In U.S. v. Dunn, 480 U.S. 294, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987), D.E.A. agents entered the defendant's property without a warrant to track chemicals sold to him which could be used to manufacture amphetamine and phenylacetone. The defendant's ranch was surrounded by a perimeter fence and contained several interior fences including one which enclosed the residence and a greenhouse. Two barns were fifty yards outside this fence, and the large barn was encircled by a wooden fence. One of the agents smelled phenylacetic acid coming from the direction of the barns, and when the agents looked inside the larger barn, they saw what they believed to be a phenylacetone laboratory. The agents did not enter the barn, but they did go back two subsequent times to confirm the laboratory's presence. The agents obtained a search warrant based on their observations. They seized chemicals, equipment, and bags of amphetamines. The federal district court denied the defendant's motion to suppress, but the U.S. Fifth Circuit Court of Appeals reversed the conviction on the basis that the defendant had a reasonable expectation of privacy in the barn because it was within the curtilage of the residence. The U.S. Supreme Court reversed, finding that the barn lay outside what could be considered the curtilage of the defendant's home, in that the barn was some fifty yards from the house, it was not within the fence that enclosed the house, it was not used for the "intimate activities" of the house, and it was not protected from observation by persons standing in open fields. The court additionally found that even if the defendant had an expectation of privacy in the barn which was independent from his home's curtilage, there was no violation of the *572 Fourth Amendment because the D.E.A. agents were standing in the open field upon which the barn had been built. Quoting Oliver v. United States, 466 U.S. 170, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984), the court noted:
[A]n open field is neither a "house" nor an "effect," and, therefore, "the government's intrusion upon the open fields is not one of those `unreasonable searches' proscribed by the text of the Fourth Amendment." The Court expressly rejected the argument that the erection of fences on an open fieldat least of the variety involved in those cases and in the present casecreates a constitutionally protected privacy interest. "[T]he term `open fields' may include any unoccupied or undeveloped area outside of the curtilage. An open field need be neither `open' nor a `field' as those terms are used in common speech." It follows that no constitutional violation occurred here when the officers crossed over respondent's ranch-style perimeter fence, and over several similarly constructed interior fences, prior to stopping at the locked front gate of the barn. (citations omitted)
Dunn was cited in State v. Magouirk, 539 So.2d 50 (La.App. 2d Cir.1988). In Magouirk, the appellate court upheld the seizure of a bag containing various items of evidence which had been thrown into a river running at rear of the defendant's father's property. The bag and its contents were held to have been validly seized under the "open fields" doctrine.
In State v. Broussard, 560 So.2d 694 (La.App. 3d Cir.1990), writ denied, 566 So.2d 981 (La.1990), the police found a knife in a trash pile forty feet behind the house where the defendant had murdered his wife. The police also found a pipe wrench in the front yard. Both the knife and the pipe wrench had been used to commit the murder, and no search warrant had been obtained prior to their seizure. The Third Circuit upheld the seizure under the open fields doctrine.[1]
Although the open fields doctrine was not cited in State v. Brown, 395 So.2d 1301 (La.1981), in that case the Supreme Court upheld the seizure of glass fragments found in the driveway of the defendant's home. The court held that the defendant did not have a reasonable expectation of privacy in his driveway since there was nothing in the record to suggest that the area was fenced, that there was a gate in the driveway, or that easy access was otherwise denied to visitors.
In the present case, the search of the fire and the seizure of evidence therefrom was valid under the open fields doctrine. The fire was in an area some sixty to seventy yards from the main house, and the fire was visible from the highway and to the people of the neighbors. Moreover, the field was not fenced. Defendant did not have a reasonable expectation of privacy in the fire; hence, it was not necessary that a search warrant be obtained to search the fire.
Moreover, the search was valid on the basis of defendant's having consented to it. Consent is an exception to the warrant requirement, and the State bears the burden of proving that the defendant freely and voluntarily gave his consent. State v. Owen, 453 So.2d 1202 (La.1984); State v. Alexis, 514 So.2d 561 (La.App. 4th Cir. 1987). The validity of the consent depends on if it were free of duress or coercion, whether express or implied. Id.
The first issue is whether defendant even gave either forced or voluntary consent to Detective Voebel to poke through the fire. The detective asked defendant for a rake; but defendant said he did not have one and got a hoe for Detective Voebel to use. Although defendant did not specifically tell Detective Voebel in so many words that he could search the fire, defendant's act in handing him the hoe should be deemed consent to the search. *573 Considering the fact that defendant gave his consent, there is nothing in the record to show that this consent was given under any sort of duress or coercion. Based on the testimony of Detective Voebel and Deputy Moore, defendant freely and voluntarily consented to the search. The trial court did not err in not suppressing the evidence seized from the fire.
The final search and seizure to be analyzed was the search of the shed where defendant lived. This search took place after defendant had been arrested and taken into custody. From the record, it appears that no warrant was ever obtained for this search which was conducted over a two day period. As noted previously, the State has not filed a brief setting forth what it feels would have been the legal justification for this warrantless search. From the transcript of the motion to suppress hearing, it appears that the State justified the warrantless search on the basis of exigent circumstances. The exigent circumstance apparently relied upon by the State was the feared destruction of evidence by some dogs at the farm. The various deputies who testified said that they saw some dogs running around outside, and one deputy said that he saw a dog lying on a mattress in the shed.
Police entry into a residence under exigent circumstances is a recognized exception to the warrant requirement. State v. Hathaway, 411 So.2d 1074 (La. 1982). Exigent circumstances are exceptional circumstances which, coupled with probable cause, justify entry into a protected area that would be unlawful in the absence of those exceptional circumstances. Id. The destruction of evidence is considered an exigent circumstance. State v. Hall, 555 So.2d 495 (La.App. 4th Cir.1989), writ denied, 577 So.2d 44 (La.1991).
Although there was a possibility that the dogs could have destroyed evidence, the officers could have easily prevented such an occurrence while they obtained a search warrant. The dog in the shed could have been called out, and the door shut to keep out that dog and any others. Additionally, the dogs could have been either chased away or tied up. The circumstances were not so exceptional that they justified the warrantless search of defendant's living quarters.
Moreover, the warrantless search cannot be justified under a "murder scene" exception. The "murder scene" exception has been unequivocally rejected by the United States Supreme Court. Thompson v. Louisiana, 469 U.S. 17, 105 S.Ct. 409, 83 L.Ed.2d 246 (1984); Mincey v. Arizona, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). This case did not have the situation where the officers had to look for any other victims or for the perpetrator on the premises.
Since the trial court erred in part in denying the motion to suppress the evidence, it must be determined whether the error was harmless. The harmless error analysis has been applied in cases where the trial court erroneously admitted evidence which had been seized in violation of the defendant's constitutional rights. State v. Taplette, 545 So.2d 985 (La.1989); State v. White, 399 So.2d 172 (La.1981); State v. Gibson, 391 So.2d 421 (La. 1980). The error involved in the present case is a "trial error" as opposed to a "structural defect in the trial mechanism" in that error is one which occurred in the presentation of the case to the jury and which may be quantitatively assessed in the context of the other evidence so as to determine whether its admission was harmless beyond a reasonable doubt. Arizona v. Fulminante, ___ U.S.___, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991); State v. Cage, 564 So.2d 303 (La.1991). An error is harmless if there is no reasonable possibility that it might have contributed to the conviction and that the error is harmless beyond a reasonable doubt. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); State v. Gibson, supra. In Rose v. Clark, 478 U.S. 570, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986), the United States Supreme Court stated:
We have emphasized, however, that while there are some errors to which Chapman does not apply, they are the exception and not the rule. Accordingly, *574 if the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other errors that may have occurred are subject to harmless-error analysis. The thrust of the many constitutional rules governing the conduct of criminal trials is to ensure that those trials lead to fair and correct judgments. Where a reviewing court can find that the record developed at trial establishes guilt beyond a reasonable doubt, the interest in fairness has been satisfied and the judgment should be affirmed. As we have repeatedly stated, "the Constitution entitles a criminal defendant to a fair trial, not a perfect one." (citations omitted)
In State v. White, supra, the erroneous admission of a gun, holster, and photographs of the murder scene which had been acquired without a search warrant was harmless error because the only disputed factual issue was the defendant's intent.
In State v. Taplette, supra, the erroneous admission of an illegally seized gun was found to be not harmless where the gun was necessary to refute the defendant's testimony. A bullet had been removed from a van, and the bullet matched the defendant's gun. The defendant claimed that he had not shot at the police officer near the van, but had instead shot into the air. The police officer and another witness had testified that the defendant had shot at the officer. Because the illegally seized gun substantially supported the State's case in Taplette, the erroneous admission of the gun was not harmless error.
During his closing argument in the instant case, counsel for defendant stated:
He admitted that he had killed Dubois. You heard his statement. The statement that he gave voluntarily. He admitted he killed him. The real issue at fact is, did he have a right to kill that man. Did Kenneth Dubois deserve to die. Those are the real two issues here today.
Hence, the issue in the instant case was not whether defendant was the killer, but whether defendant acted in self-defense. It cannot be said that there is a reasonable possibility that the erroneously admitted evidence contributed to defendant's conviction for manslaughter.
The rifle and the various items seized from the house were fairly insignificant items in the State's case against defendant when compared to defendant's confession (the admissibility of which will be discussed in Assignment of Error No. 2, infra). The illegally seized evidence had no bearing on the issue of self-defense. Therefore, the error in admitting that evidence was harmless beyond a reasonable doubt. This assignment of error is without merit.

ASSIGNMENT OF ERROR NO. 2
In his second assignment of error, defendant complains that the trial court erred in not granting his motion to suppress the confession. He asserts that his initial inculpatory statement made at the farm was illegally obtained in that he should have been advised of his Miranda rights when he was detained by Deputy Moore while Detective Voebel searched the fire. He argues that the illegal seizure of his gun along with his being detained was actually an arrest; thus, he should have been told of his right to remain silent. Because of this illegality, his subsequent confession at the parish jail should have been suppressed as the fruit of an unlawful arrest.
Before a confession can be introduced into evidence, the State bears the burden of affirmatively proving that it was free and voluntary and not made under the influence of fear, duress, intimidation, threats, inducements, or promises. State v. Robinson, 384 So.2d 332 (La.1980); La. C.Cr.P. art. 703(D). The State must also show that a defendant who confesses during custodial interrogation was first advised of his rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Custodial interrogation includes situations which fall short of an actual arrest but where the accused is questioned by the police in a setting which indicated that he has been deprived of his freedom of action in a significant way. State v. Watkins, 526 So.2d 357 (La.App. *575 4th Cir.1988). This determination is made on a case by case basis, and the factors involved include whether there was probable cause to arrest prior to questioning, whether the statements and actions of the police indicate an intent to hold or restrain the accused, whether the accused reasonably believed he was restrained, and the extent to which the investigation had focused on the accused. Id. However, spontaneous and voluntary statements not made as a result of police interrogation or compelling influence are admissible in the absence of Miranda warnings even if the accused is in custody. State v. Robinson, supra; State v. Lambertus, 482 So.2d 812 (La.App. 4th Cir.1986).
In the present case, the record does not support defendant's claim that he was under arrest or otherwise in police custody at the time he made the initial inculpatory statement that he had killed Dubois. Deputy Moore brought defendant over the porch at Detective Voebel's suggestion in order to get out of the rain that had begun to fall and not to hold or restrain defendant. Defendant cannot be deemed to have been under arrest at that point. Even if it could be said that defendant was in a situation short of an actual arrest but was deprived of his freedom in a significant way, his statement to the officers was spontaneous and voluntary. He was not being questioned by either officer at the time; thus, Miranda warnings were unnecessary. This assignment of error is without merit.

ASSIGNMENT OF ERROR NO. 3
In this assignment of error, defendant complains that the trial court erred in adjudicating him a second offender because the State failed to prove that less than five years had elapsed between his release from custody on the predicate offense and the commission of the present offense. He further argues that the trial court erred in using the date his maximum sentence would have expired rather than the date he was actually released.
Defendant was arrested for simple burglary on April 18, 1983, and on June 15, 1983, he pled guilty. He was sentenced to eighteen months in the parish jail with credit for time served. At the multiple bill hearing, Mrs. Helen Gleason, the supervisor of the Criminal Records Room for the Plaquemines Parish Sheriff's Office, testified as to the records from the prior conviction for simple burglary. She stated that defendant was released on June 18, 1983 based on a card in the record which stated: "Trustee time. 6/18/83." She further testified that had he served the full term he would have been released on February 18, 1984.
The State must produce prima facie evidence that five years have not elapsed since the date of discharge from custody for the predicate offense. State v. Tropez, 546 So.2d 1376 (La.App. 4th Cir. 1989). That is, the State must prove less than five years elapsed between the actual end of the previous sentence and the commission of the subsequent felony. State v. Nasworthy, 542 So.2d 715 (La.App. 4th Cir. 1989). It is the actual date of discharge from supervision which determines the start of the five year period not the sentence which was imposed because discharge can take place earlier than the theoretical date on which the sentence would have terminated because of a pardon, commutation, or good time credit. State ex rel. Wilson v. Maggio, 422 So.2d 1121 (La. 1982); State v. Anderson, 349 So.2d 311 (La.1977).
The State failed to establish a prima facie case that less than five years elapsed from the actual date of discharge for the 1983 simple burglary conviction and the commission of the present offense. There was no evidence as to the date defendant was actually discharged from custody, and the trial court erred in finding him to be a second offender. His adjudication as a second offender must be vacated, and the case remanded for resentencing.
For the foregoing reasons, we affirm defendant's conviction, vacate the habitual offender sentence, and remand for resentencing.
*576 CONVICTION AFFIRMED; SENTENCE VACATED; REMANDED FOR RESENTENCING.
BARRY, Judge, dissents with written reasons.
This record requires close scrutiny on review.
The tape and transcript of defendant's confession were introduced into evidence. The jurors read the transcript as the tape was played.
The defendant, who had completed the sixth grade and was unable to read or write, admitted that he killed Dubois but he did not intend to do so. He stated he killed Dubois because "that man libbel [sic] to kill me that night." The defendant stated he did not know what to do, was scared, and he placed Dubois' body on tires and ignited them.
The defendant related that he and Dubois had been drinking beer all day. The defendant had eight beers and Dubois' three or four. The two men went to Marginal's Grocery Store and purchased more beer which they drank. They returned home at dark and a short time later Dubois kicked the defendant's little dog. The defendant warned Dubois not to kick the dog again and then got up to urinate. After being struck on the head by Dubois and knocked to the floor, the defendant crawled out of the door as Dubois threatened to get a knife and cut him. The defendant went around the corner of the house, got his .22 rifle and stepped back into the doorway. As Dubois turned around the defendant "just pulled the trigger." Dubois did not have a knife in his hand and did not come toward the defendant. The defendant did not know where the bullet struck Dubois.
The defendant stated that Dubois had been living with him until he (Dubois) went to court for the homicide of his father. The defendant was afraid to have a man like Dubois live with him, but his boss let Dubois stay there. He had known Dubois for ten years.
The evidence was improperly admitted. If the confession was admissible, it convinces me that the defendant acted in self-defense.
NOTES
[1] The appellate court also upheld the search and seizure on two other exceptions to the warrant requirement, plain view and consent.