liWALTZER, Judge.

PROCEDURAL BACKGROUND

This writ was originally presented to this court on the State’s application for Writ of Certiorari and Prohibition. On 28 June 1996 a divided panel of this court affirmed the trial judge’s ruling that certain evidence seized, after an allegedly consensual search, should be suppressed. We affirmed the trial court, because we found that the trial judge’s credibility determination was amply supported by the evidence adduced at the motion hearings and that he had not abused his discretion. Our Supreme Court granted the State’s application for writs and remanded to our court for briefing, argument, unless waived, and opinion on 1 November 1996.
Both relator and respondent have briefed the issues, and we have now all transcripts of the proceedings at the motion to suppress. We have also reviewed the police report, the purported consent to search and rights of arrestee forms, confected in connection with this case. We have invited the State on numerous occasions to provide us with a transcript of a preliminary hearing purportedly held in Magistrate Court (presumably *324 some time before the Grand Jury Indictment in this ease and before the motion hearings in the District Court); we proceed now without this, transcript.

STATEMENT OF THE CASE

Relator complains that the trial court erred in granting the Respondent’s Motion to Suppress Evidence. Relator contends that |2the evidence is admissible under several exceptions to the prohibition of warrantless searches under the Constitutions of the United States and the State of Louisiana. U.S.C.A. Const. Amend. 4; LSA-Const. Art. 1, See. 5. Specifically, Relator argues: 1) that the trial court erred in determining the consent of the owner of the residence was involuntary (i.e. given under duress or as a result of coercion) because the consent was attenuated from the illegal conduct of the officers; and 2) the trial court erred in failing to consider alternative exceptions to the prohibition of warrantless searches because the evidence would be admissible under the “hot pursuit”, “plain view” and “inevitable” discovery exceptions.

STATEMENT OF FACTS

Sgt. Bruce Little and Police Officer Tony Mayfield separately responded to an anonymous complaint via police dispatcher that two unknown, armed black males were seen entering 627 South Solomon Street. The suspects were described as one wearing dark blue pants and a blue and white striped shirt, 6’2”, weighing 235 lbs., the other wearing a black jogging suit. The address in question was part of a double, one side bearing the address of 627 and the other 629. There is no connecting inside door between the residences. Officer Mayfield secured the rear of the building while Sgt. Little approached the front of the house. There Sgt. Little encountered a subject matching the description broadcast by the dispatcher, later identified as Matthew Nellon, on the porch of 629 South Solomon Street, as he climbed the steps onto the porch of the building, Sgt. Little testified that he informed Nellon that he was a police officer, responding to a complaint of two armed men. Sgt. Little further testified that when he asked Nellon to put his hands against the wall, Nellon became nervous and tensed up. According to Sgt. Little, Nellon swung around his body, struck him across the chest, and knocked his police radio out of his hand onto the front lawn of the residence. When Nellon proceeded to enter 629 |3South Solomon Street, Sgt. Little grabbed him in order to conduct a pat down frisk. After a mutual scuffle, Sgt. Little saw Nellon go for his waistband. Sgt. Little testified that after he pinned Nellon’s arms to his body, both fell into the residence at 629 South Solomon Street. Prior to faffing unto the bed, where the struggle continued, Nel-lon took out a package and threw it towards the headboard area. Sgt. Little also testified that Nellon came up with a weapon, which he knocked out of Nellon’s hand unto the floor. The gun Sgt. Little recovered was a fully loaded, nine millimeter semi-automatic pistol and six packets of heroin both of which were retrieved after Nellon discarded them inside the residence. Nellon was arrested for battery of a police officer, possession of heroin, and possession of a firearm, after having been advised of his rights, which Nellon waived by signing a form. After this arrest, Sgt. Little requested permission to search the premises without a warrant. When it was discovered that Nellon’s mother, Gloria owned the premises, he had relatives contact the owner. While Sgt. Little admitted that Ms. Nellon requested to call her attorney before she decided to give consent to search, he denied under oath that he ever coerced Ms. Nellon to sign the consent to search form and specifically denied that he ever told her that in default of signing the consent to search form, all present would be taken to jail. Sgt. Little strenuously denied to have told the attorney with whom he spoke prior to the consent search, that if consent was not forthcoming everyone in the residence would be arrested and taken to jail. He also denied that this threat was ever communicated to anyone. After the consent to search form was signed, the Respondent admitted to additional heroin in the residence. From another bedroom $2,465 and an additional 23 dosage units of heroin, personal papers, clothing, a beeper and a cell phone were confiscated.
I ¿¡Respondent asserts that Sgt. Little rushed onto the porch and startled Nellon as *325 he and his niece were leaving 629 South Solomon Street. He also avers that Sgt. Little pushed and forced him back into the front room of the home and arrested him there. Pertaining to the consent to search the premises, testimony was given by Alan Abadie, a lawyer and former police officer and director of security at Loyola University for ten years. Mr. Abadie testified that on the day in question he received a telephone call from Gloria Nellon who represented that she was calling from her home. He further testified that he talked to Sgt. Little who was with Ms. Nellon with regard to a search for narcotics. When questioned about the conversation he testified as follows:
[The detective] indicated that they had wanted to search the house for narcotics that they believed Matthew Nellon had in the house, and they wanted Matthew Nel-lon’s consent for that search. They indicated to me that if they received that consent, they would not exercise their right to take everyone in the house under constructive possession to jail. If they were forced to get a search warrant, they would arrest everyone in the house.
* * * * * *
Basically, I said, look, if you have anything — and I don’t want to know if you have anything- — and you show them where it is or let them search, then you are the only one that goes to jail. If they are forced to get a search warrant, the officer said they would take anyone. And the officer gave me his word that if he had a consent to search, he wouldn’t take everyone in the house. I told the young man, “You do whatever you think you have to do. If you want your mother to go to jail, they can get a search warrant. If you want to keep her out of jail, then you know what you should do.”
In addition the Respondent presented testimony that while he and Sgt. Little were inside of 629 South Solomon Street, other officers responding to the dispatch arrived at 627. The testimony of Respondent’s sister and her fiance, who also reside at 627, was that the fiance owned and kept a Ruger P-89 nine millimeter gun under the mattress of their bed in the second bedroom of 627. Respondent’s sister also testified that her 15fianee was at work when the police arrived and that she was not present when the officers searched her residence. She testified that the gun confiscated by the police, was seen by her the last time the night before, when her fiance placed it under the mattress. She also testified that Sgt. Little was one of the officers who went into 627 South Solomon Street where the gun was hidden under the mattress. Ms. Nellon’s fiance, Mr. Wilson, testified that he last saw the gun when he placed it under the mattress the night before the arrest of the defendant. Additionally, he testified that the gun was still under the mattress in the morning when he left' for work, but was gone when he returned home on the evening the Respondent was arrested. At the hearing Mr. Wilson produced a document showing that he was the registered owner of the gun allegedly seized during the arrest of Respondent.
At the conclusion of the hearing on the motion to suppress, the trial judge remarked that it was now “DOWN TO CREDIBILITY”. The judge remarked that he was not bothered about what the lawyer said to the Nellons when they sought his advice, but that he was concerned about what Sgt. Little said to Ms. Nellon, i.e., either you sign or everyone will go to jail. More importantly, the trial judge made specific mention of the fact that Sgt. Little had denied, under oath, that he ever made that threat. The trial judge said specifically:
We are not talking law now. We are talking facts. Do I believe the police officer when he said, I did not force, threaten, coerce, or intimidate this lady into signing this consent. form or now do I believe a totally contradictory statement which was made by a witness for the defendant?
* * * * * *
It goes to credibility now. It gets to credibility. I’m easting — -his whole credibility is now being questioned.
******
I don’t know if he is not being candid about something that I feel as significant as this, how can I question whether he’s *326 being credible about other things concerning the factual basis for the warrant?
| (SThe trial court found probable cause for the arrest of the defendant. He bound the defendant over for trial on the charge of possession of a gun, having been previously convicted of a narcotics violation, and possession of heroin. However, the trial judge suppressed the evidence found after the consent search was allegedly signed.

ANALYSIS

Consent is an exception to the warrant requirement of the Fourth Amendment of the United States and the Louisiana Constitutions. The State bears the burden of proving that the defendant freely and voluntarily gave his consent. The issue of the consent is factual and may be determined by district court by weighing the credibility of conflicting witnesses as well as the surrounding circumstances, and its determination is entitled to great weight on review. State v. Wilson, 467 So.2d 503 (La.1985), cert. den. Wilson v. Louisiana, 474 U.S. 911, 106 S.Ct. 281, 88 L.Ed.2d 246 (1985); State v. Brown, 598 So.2d 565 (La.App. 4 Cir.1992), writ den. 605 So.2d 1092 (1992); State v. Valenzuela, 590 So.2d 89 (La.App. 4 Cir.1991), writ den. 593 So.2d 380 (1992), cert. den. Valenzuela v. Louisiana, 506 U.S. 843, 113 S.Ct. 130, 121 L.Ed.2d 84 (1992).
In State v. Alexis, 514 So.2d 561 (La. App. 4 Cir.1987) conduct by police in informing defendant’s father that if he did not consent to search of family’s home, police would obtain warrant and if any drugs were found on premises the entire family would be taken to jail, but if consent was given, the drugs were found, only defendant would be arrested, constituted illegal duress or coercion that vitiated father’s free and voluntary consent. We find the instant factual situation identical to that in Alexis. More importantly, the trial judge clearly stated that he did not only consider the officer’s conduct as coercive, but he repeatedly questioned the officer’s credibility when he |7steadfastly denied ever having made the coercive statements attributed to him. The trial court correctly held that there was probable cause for the police to arrest the defendant, because Sgt. Little had the right to stop and frisk the defendant for weapons, especially so since the dispatch had advised of an armed suspect whose description Nellon matched. LSA-C.Cr.P.art. 215.1. When Sgt. Little and Nellon continued to struggle into the house, Sgt. Little had the right to arrest Nellon for possession of a weapon and 6 packets of heroin, because these items were retrieved incident to arrest from the immediate surroundings of Nellon and in plain view, after Sgt. Little was allegedly battered.
Because the trial court heard the evidence, saw the witnesses, and made a credibility call that a) the police officer was not credible, and b) that the consent to search was coerced, the evidence seized after the consent to search form was employed was correctly suppressed.
Relator’s claim that the 23 units of heroin would have been “inevitably” discovered and that it, therefore, makes little difference whether the consent was coerced or the police officer was found to be untruthful, is insupportable. The doctrine of inevitable discovery only comes into play, when the pertinent evidence is the product of illegal government activity and would have been discovered inevitably by lawful means without regard to the illegality. Nix v. Williams, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). We question whether the officer would have been able to obtain a search warrant for the entire premise at 629 South Solomon Street on the basis of the information given to the dispatcher that two armed men were to come out of 627 South Solomon Street and, that, pursuant to a scuffle with the police a suspect had fallen with a gun, discarding a packet of heroin near a headboard in a room at 629 South Solomon Street, after he fell from the porch into the home owned by his mother. |8In our view Relator has not established, by a preponderance of the evidence, that “ultimately and inevitably” the heroin would have been discovered by lawful means.

CONCLUSION

The record in this case convinces us that the trial court’s ruling is supported by ample evidence. The trial judge’s determination as *327 to the credibility of the 'witnesses are to be accorded great weight.

ACCORDINGLY, THE WRIT OF CER-TIORARI IS GRANTED, THE RULING OF THE TRIAL COURT IS AFFIRMED.

SCHOTT, C.J., dissents.